UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GERALD WOODS and PATRICIA
WOODS, on their own behalf and on
behalf of their minor child, T.W.,                    Case No. 1:09-cv-243

      Plaintiffs/Counter-Defendants,              HON. JANET T. NEFF

v

NORTHPORT PUBLIC SCHOOL and
NORTHPORT PUBLIC SCHOOL
BOARD OF EDUCATION,

      Defendants/Counter-Claimants.

_____/


**OPINION**

      Plaintiffs, the parents of T.W., initiated this action pursuant to the Individuals with

Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.,* against the Northport Public School

and its school board, the school district where T.W. was enrolled for several years. Plaintiffs' action

includes a request for attorney fees (Count I), an appeal from the administrative decision below

(Counts II through V), and a breach of contract claim (Count VI). Defendants have also filed a

Counterclaim to appeal from the administrative decision. This Court has expended many resources

and much effort to manage this case and now decides the parties' pending cross-motions. The cross-

motions present a plethora of overlapping arguments, which this Court has attempted to synthesize

and organize, employing the following outline:

     I.       BACKGROUND
           A.     The IDEA
           B.     Relevant Facts

  C.  Procedural Posture

II.  APPEAL FROM THE IHO'S DECISION AND ORDER
  A.  Jurisdiction
  B.  Standard of Review
  C.  Analysis
    1.  2006-07 IEP (Plaintiffs' Count III & Defendants' Counterclaim)
      a.  *Resource Program Services*
      b.  *Physical Therapy*
      c.  *In-house ASD (Type B) Teacher Consulting Services*
      d.  *Assistive Technology Process*
    2.  2007-08 IEP (Plaintiffs' Count III & Defendants' Counterclaim)
      a.  *Parental Participation*
      b.  *Present Level of Academic Achievement and Functional Performance*
      c.  *Access to Evaluation Protocols*
      d.  *Elimination of Special Education Academic Programming*
    3.  "Hostile Environment"
      a.  *Plaintiffs' Claim* (Plaintiffs' Count II)
      b.  *Plaintiffs' Requested Remedy* (Plaintiffs' Counts IV & V)
    4.  Plaintiffs' Request for Attorney Fees & Costs (Plaintiffs' Count I)

III.  PLAINTIFFS' BREACH OF CONTRACT CLAIM (Plaintiffs' Count VI)
  A.  Jurisdiction
  B.  Standard of Review
  C.  Analysis

IV.  CONCLUSION

For the reasons that follow, the Court determines that Defendants' Motion for Judgment on the Administrative Record pursuant to FED. R. CIV. P. 12(c) (Dkt 103) is properly DENIED, and Plaintiffs' Cross-Motion for Summary Judgment or Alternatively Judgment on the Administrative Record (Dkt 104) motion is properly GRANTED IN PART and DENIED IN PART. The Court denies Defendants' motion and grants Plaintiffs' motion to the extent it agrees with Plaintiffs that they succeeded in demonstrating certain failures by Defendants in properly implementing the 2006-07 and 2007-08 Individualized Education Programs (IEPs), as alleged in Count III. The Court grants Plaintiffs' motion to the extent it agrees with Plaintiffs that they succeeded in demonstrating limited entitlement to the attorney fees and costs requested in Count I. The Court denies Plaintiffs' motion

2

to the extent the Court rejects Plaintiffs' "hostile environment" claim in Count II, the associated remedies requested in Counts IV and V, and Plaintiffs' breach of contract claim in Count VI.

## I. BACKGROUND

### A. The IDEA

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, is a Spending Clause statute that seeks to ensure that "all children with disabilities have available to them a free appropriate public education" (FAPE), § 1400(d)(1)(A). The Act "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, but imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 52 (2005) (quoting *Board of Ed. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 183 (1982)). Participating states must certify to the Secretary of Education that they have policies and procedures that will effectively meet the Act's conditions, 20 U.S.C. § 1412(a). *Id.* State educational agencies, in turn, must ensure that local schools and teachers are meeting the state's educational standards, §§ 1412(a)(11), 1412(a)(15)(A). *Id.* Local educational agencies (school boards or other administrative bodies) can receive IDEA funds only if they certify to a state educational agency that they are acting in accordance with the state's policies and procedures, § 1413(a)(1). *Id.* at 52-53.

As the Supreme Court observed, "[t]he core of the statute ... is the cooperative process that it establishes between parents and schools," and the "central vehicle for this collaboration is the IEP process." *Schaffer,* 546 U.S. at 53. "State educational authorities must identify and evaluate disabled children, 20 U.S.C. §§ 1414(a)-(c), develop an IEP for each one, § 1414(d)(2), and review

every IEP at least once a year, § 1414(d)(4)." *Id.* The Act requires that an IEP include, among other things,

    (I)       a statement of the child's present levels of educational performance, . . .;

                         . . . .

    (II)      a statement of measurable annual goals, including academic and functional goals, . . . ;

                         . . . .

    (III)     a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

    (IV)     a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child . . . ;

    (V)      an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV) . . . .

20 U.S.C. § 1414(d)(1)(A).

Parents and guardians play a significant role in the IEP process. *Schaffer*, 546 U.S. at 53. They must be informed about and consent to evaluations of their child under the Act, § 1414(c)(3). *Id.* Parents are included as members of "IEP teams," § 1414(d)(1)(B). *Id.* They have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child," § 1415(b)(1). *Id.* They must be given written prior notice of any changes in an IEP, § 1415(b)(3), and be notified in writing of the procedural safeguards available to them under the Act, § 1415(d)(1). *Id.* If parents believe that an IEP is not appropriate, then they may seek an

administrative "impartial due process hearing," § 1415(f). *Id.* School districts may also seek such hearings. *Id.*

Congress legislated only the central components of due process hearings. *Schaffer*, 546 U.S. at 54. It imposed minimal pleading standards; provided that all parties may be accompanied by counsel; and indicated that parties may present evidence and confront, cross-examine, and compel the attendance of witnesses, §§ 1415(h)(1)-(2). *Id.* After the due process hearing, any aggrieved party may bring a civil action in state or federal court, § 1415(i)(2). *Id.*

**B. Relevant Facts**

At the heart of this litigation is T.W., the son born to Plaintiffs on September 30, 1998. T.W. was diagnosed with autism and cerebral palsy, disabilities that qualify him for special education and related services under the IDEA. Plaintiffs live within the Northport School District, a geographically remote school district in Northern Michigan. The Northport School District is also one of the smallest school districts in the State of Michigan, with a total kindergarten-through-12th grade population of approximately 150 students and a total staff of only 16 teachers (Dkt 130, Dfs. Br. Ex. 2 at 9, n.3; Dkt 29, 6/22/2009 Hr'g Tr at 8-9).

T.W. began half-day kindergarten at Northport Public School in 2004. In May 2005, plaintiff Gerald Woods won a seat on the school board. An IEP was developed June 6, 2005 and implemented September 6, 2005, when T.W. attended first grade (Admin. Record, Joint Ex. 1). Plaintiffs subsequently filed a due process hearing request in the State Office of Administrative Hearings and Rules (SOAHR) challenging the June 6, 2005 IEP. However, on October 14, 2005, before the due process hearing, the parties reached a Settlement Agreement. On October 26, 2005, the parties stipulated to a dismissal of the then pending administrative proceeding.

A second IEP was developed May 3, 2006 and implemented October 24, 2006, when T.W. attended second grade (Admin. Record, Joint Ex. 2). A third IEP was developed May 14, 2007 and implemented in the fall of 2007, during T.W.'s third grade year (*id.*, Joint Ex. 3).

On August 31, 2007, Plaintiffs initiated another administrative proceeding (no. SEH 07-61), requesting the appointment of an Independent Hearing Officer (IHO) to hear their dispute with Defendants, which concerned whether T.W. had been afforded a FAPE during the 2005-06 and 2006-07 school years and whether the IEP proposed for the 2007-08 school year was also deficient. The IDEA mandates that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j) (the "stay put" rule). The parties concede that while counsel for the parties discussed the nature of T.W.'s pendency placement, neither party requested the IHO to issue a "stay put" order, and the IHO never did so (Dkt 33 at 5, n.1; Dkt 29, 6/22/2009 Hr'g Tr at 6, 28-29).

The parties do not dispute that on November 2, 2007 and again on November 16, 2007, more than ten days before the due process hearing began, Defendants proffered a "Ten-Day Offer" under 20 U.S.C. § 1415(i)(3)(D)(*i*)(I & II) in an effort to avoid the due process hearing (Dkt 107, Attachment D). Plaintiffs did not accept either settlement offer (Dkt 107 at 23; Dkt 106 at 28).

The due process hearing took place over thirty-two days between November 2007 and August 2008 (Dkt 1, Compl. ¶ 21). The IHO heard testimony from thirty-seven witnesses, testimony that is contained in thirty-two volumes and exceeds 7000 pages (*id.*). Further, hundreds of exhibits were submitted and entered into the Administrative Record. The parties submitted post-hearing briefs to summarize the evidence, the applicable law, proposed findings of fact, and relief requested

(*id.* ¶ 23).  Plaintiffs' brief was 426 pages in length (*id.*).  Defendants' brief was 118 pages (*id.*).  The replies were 152 and 48 pages, respectively (*id.*).

Meanwhile, on June 9, 2008, a fourth IEP was developed, but it was never implemented. Plaintiffs removed T.W. from the school and began to privately educate him.  In August 2008, Plaintiff Gerald Wood was recalled from his Board seat.

On February 2, 2009, the IHO issued a 141-page Decision and Order (Admin. Record, IHO Dec. & Order).  The IHO addressed twelve main topics and ultimately granted in part and denied in part Plaintiffs' due process complaint.  The IHO determined that Defendants' "performance on the IEP terms for the 2006-2007 school year was seriously deficient" inasmuch as "[a]greed upon services were not implemented," "consultative/direct work of the resource program teacher was not done and the district never arranged for the agreed upon contribution of the outside autism intervention consultant," and "[t]he meager amount of teacher consultant time was insufficient to allow meaningful input into creation or delivery of any specially designed academic instruction" (IHO Dec. & Order, p 129, Findings of Fact ¶ 267).  The IHO found that "[n]eglible progress in the general curriculum was the predictable result" (*id.* ¶ 268).  Similarly, regarding T.W.'s 2007-08 school year, the IHO found that "[l]ess instructional assistance was offered overall in that neither resource program consultative services nor autism intervention specialist services were offered" and "[o]verall academic growth was also lacking" (*id.* ¶ 269).

The IHO delineated the following twenty-seven conclusions of law:

1.  Petitioners have not met their burden of proof to show that anything more than a *de minimus* lapse occurred where, at most, they showed that respondent may have failed to provide one of 33 sessions of direct [physical therapy (PT)] over the course of implementation period for the IEP/settlement for the 2005-2006 school year.

2.      The proofs show, by a preponderance, that respondent did not provide at least 4 hours of the 8 hours of in-house consultative PT service required by the IEP/Settlement governing Student's program for the 2005-2006 school year.

3.      Petitioners have not carried their burden of proof to show that Student suffered any tangible loss of service or benefit due to an 8-week delay in respondent's development and implementation of an outside consultant's recommended revisions to Student's Physical Therapy goals and objectives because the revisions amount to semantic adjustments and not substantive changes.

4.      Petitioners have shown, by a preponderance of the evidence under either a strict compliance or substantial compliance analysis, that respondent did not carry out its obligation to secure an evaluation of Student and recommendation for services by an outside PT expert where the evaluation instrument was administered by and scored by an in-house employee who had never before used the instrument and who failed to adhere to the guidance provided by the chosen outside expert.

5.      Respondent's dereliction of its obligation under the IEP/settlement to obtain an evaluation by an outside expert is not excusable on the ground that the outside evaluator's conclusions, had they been obtained, would not have been binding on the IEP team in its subsequent decision regarding the matter.

6.      Petitioners have not satisfied their burden of proof to show respondent failed to obtain a needed evaluation of Student's autism instructional program where the showing was limited to proof that the required written report came to the district via email and that the emailed information was edited regarding non-substantive matters prior to being provided to petitioners.

7.      Decisions regarding a student with a disability's need for related services such as physical therapy and occupational therapy are not in violation of IDEA where the criteria applied are the student's ability to access the school environment and to participate in the general curriculum.

8.      Petitioners have not carried their burden of proof to show Student needed academic and physical therapy services as [Extended School Year (ESY)] programming where the proofs do not show the nature of recoupment Student would need following a summer vacation.

9.      This district has previously violated its commitments to make its ESY decisions with regard to this student as early as March 21 thereby resulting in decisions made so late that a denial could not be subject to due process review and neither party would have any reasonable time to secure the

services whether the services had been denied or granted. Such delay violates IDEA and permits an award of declaratory relief to mandate that this district issue any future ESY determinations regarding this Student before April 1st for ESY services for the summer of the same year.

10. Wrongful delay in re-convening an IEP meeting is not shown on the facts here where the needs of either or both of the parties' required the lengthy intervals.

11. The evidence shows that respondent did not fully implement the consultative PT service where only one occasion in which consultative service was described and the IEP commitment called for a total of 4 hours over the months that the IEP was in effect.

12. The in-house autism spectrum teacher consultant services for the 2006-2007 implementation period were offered at a pre-determined service level that was insufficient to allow the teacher consultant to meet Student's needs.

13. Petitioners showed, by a preponderance of the evidence, that respondent did not comply with the requirements of the 2006-2007 IEP (Jt-2) in that neither the outside autism intervention consultation nor the resource program services were implemented. These are substantial and significant aspects of the IEP that went wholly unimplemented.

14. Respondent's efforts to conduct an Assistive Technology [AT] evaluation were deficient as it consumed far more than the 30 school days allowed under the Michigan administrative rules and it ignored petitioners' request as members of the IEP team that Student's reading comprehension needs be addressed.

15. Petitioners' requests for copies of test protocols were improperly handled where respondent, or its agent, applied its protocol release "policy" inconsistently and selectively, caused some protocols to be misdelivered, knowingly failed to correct this misdelivery and failed to notify petitioners that the mail delivery was returned unclaimed until the IEP meeting was in progress, notwithstanding petitioners' two communications requesting such information.

16. Respondent did not adhere to the statutory and regulatory requirements for addressing petitioners [Independent Educational Evaluation (IEE)] requests in that the information regarding qualifications, expected costs, suggested sources and the right to select non-suggested sources was not provided to petitioners under 34 CFR 300.502 and R 3240.1723c.

17.     Respondent's conduct of failing to promptly disclose its qualification standards for independent evaluators and to permit timely provision of Student's test protocols substantially impaired petitioners' right to meaningfully participate in the IEP process where respondent's staff relied on the variance in the independent evaluators' training and experience and their possible inability to assess Student under the same conditions used in the school to discount the worth of the independent evaluators' determinations.

18.     Respondent's conduct in administering a non-normed locally created autism scale type assessment without first gaining petitioner-parent's consent violated the parental consent mandates of IDEA.

19.     Petitioner-parents failed to show, procedural error in that the IEP team failed to consider their input regarding programming for Student where both sides too often failed to engage in any dialog to develop the information available.

20.     On the other hand, respondent district did deny petitioners meaningful participation where respondent's representative arranged to have staff members write academic goals on the IEP form *after* the meeting had concluded, where petitioners had explicitly inquired about these goals being developed as a part of the IEP meeting and when respondent implemented the IEP with the academic goals without gaining any input from petitioner-parents on the goals.

21.     Petitioners have shown that the language describing the paraprofessional support for Student was changed during a side conversation among district staff. This change became insignificant, however because the staff IEP participants set duties and responsibilities for the paraprofessional that were consistent with the connotation supported by petitioners before the side-conversation change.

22.     Petitioners' objection that the IEP team refused to address their concerns about the inadequate language used to define the consultative nature of the PT services results in *de minimus* loss or harm.

23.     Evidence that the district representative's stated bases for excluding a Student from a standardized assessment of the curriculum are that the involved student has not mastered the curriculum or the necessary skills over the past two years in a general education classroom with some special education academic support but the IEP team reduced the special education program and services to be offered to the student the following year over the parents' assertion that they did not insist that the student remain in a general

education shows that the parents were not permitted meaningful participation on this issue by the IEP team.

24. Where [Present Level of Academic Achievement and Functional Performance (PLAAFP)] information is contradictory and does not provide concrete quantified information to define the student's baseline abilities for goals development, the written goals and objectives also lack baseline data, are imbued with ambiguity and lack ascertainable criteria for judging progress, the IEP is itself deficient.

25. Petitioners have not shown, by a preponderance of the evidence that the district erred in selecting between conflicting recommendations for AT supports and for classroom environments. Petitioners have not shown that the change in the language to describe the paraprofessional support resulted in any functional change in the aide's role. Accordingly, these changes have not been shown to have resulted in an inappropriate overall program or in a denial of FAPE.

26. Consistent, ongoing or total failure to provide instructional support services specified in an IEP whether by neglect or misconduct is a denial of FAPE. An IEP that decreases instructional support services to a child with a disability who has previously been denied promised services and who has not progressed in the general curriculum is not reasonably calculated to provide meaningful educational benefit as required by IDEA.

27. Petitioners have not established, by a preponderance of the evidence, that a hostile environment now exists so as to preclude Student from receiving FAPE or to prevent petitioners from participating in IEP matters.

Admin. Record, IHO Dec. & Order, pp 134-140.

The IHO ordered the following forms of relief:

1. Respondent shall provide consultative PT services of not less than 10 hours to provide the evaluative services found necessary by Findings of Fact ¶ 263.

2. Respondent shall provide consultative PT services from an independent PT expert, as defined in fn 33, to conduct an independent evaluation as found necessary in Finding of Fact ¶ 266.

3. Respondent shall provide compensatory education to Student for 768 hours as found necessary and as specified in Finding of Fact ¶ 270.

4. Respondent shall reimburse petitioners $2,796.90 for their IEE expenses as described above in Issue 11.

5. Each year, including 2009, that Student remains eligible to receive consideration for summer ESY services from respondent, respondent shall make and communicate its offer or denial of ESY summer programming and services by the first day of the preceding April.

6. Respondent shall afford Student a placement that conforms to the requirements of Findings of Fact ¶ 277 through 279.

7. Within 7 business days of the date of this order, respondent shall supply petitioners of proper and complete notice, in writing, to inform them of the qualifications, expected costs and the district's suggested providers for an independent AT evaluation.

IHO Dec. & Order, pp 140-41.

## C. Procedural Posture

On March 18, 2009, Plaintiffs filed the instant action, seeking a declaratory judgment of their status as prevailing parties and full reimbursement from Defendants of their reasonable attorney fees, costs, and pre-judgment and post-judgment interest under IDEA § 1415(i)(3)(A) (Dkt 1). Defendants filed an Answer to Plaintiffs' Complaint, as well as Affirmative Defenses and a First Counterclaim, in which Defendant challenged a number of the factual findings and legal rulings in the IHO's Decision and Order (Dkt 6).

On April 30, 2009, Plaintiffs filed a First Amended Complaint (Dkt 4). The relief Plaintiffs sought in their first Complaint was subsumed into Count I of their First Amended Complaint. Plaintiffs also added Counts II through V pursuant to IDEA § 1415(i)(2)(A), seeking "a modified *de novo* review and ... limited appeal as to certain findings and certain relief, or lack thereof, as contained in the IHO's Decision and Order, all based upon claimed errors of law, fact or mixed law and fact" (*id.* at 2). In Count VI, Plaintiffs allege a common law breach of contract claim.

The current six counts, as stated by Plaintiffs, are as follows:

I.      "PREVAILING PARTIES CLAIM FOR REIMBUSEMENT [sic] OF
        REASONABLE ATTORNEY'S FEES, COSTS AND PRE-JUDMENT [sic]
        AND POST JUDGEMENT [sic] INTEREST" (Dkt 4 at 16)

II.     "APPEAL THAT PORTION OF THE IHO'S DECISION AND ORDER
        DENYING THE DISTRICT CREATED A HOSTILE AND POISONED
        EDUCATIONAL ENVIRONMENT" (*id.* at 20)

III.    "APPEAL OF SELECT PORTIONS OF THE IHO's DECISION AND
        ORDER WHERE THE IHO FOUND SIGNIFICANT VIOLATIONS OF
        IDEA, BUT FAILED TO PROVIDE APPROPRIATE RELIEF AND
        FAILED TO DECIDE THE VIOLATIONS WITH FINALITY" (*id.* at 23)

IV.     "APPEAL OF THAT PORTION OF THE IHO'S DECISION AND ORDER
        CONDITIONING THE AWARD OF IDEA BASED COMPENSATORY
        EDUCATIONAL SERVICES ON THE STUDENT'S RE-ENROLLEMNT
        [sic] IN THE DEFENDANT'S PUBLIC SCHOOL" (*id.* at 33)

V.      "FAILURE TO REIMBURSE PARENTS FOR THEIR RETROACTIVE
        AND PROSPECTIVE COMPENSATORY EDUCATION EXPENSES" (*id.*
        at 38)

VI.     "BREACH OF SETTLEMENT AGREEMENT (Supplemental State Law
        Breach of Contract Claim)" (*id.* at 40).

Defendants filed an Answer to the First Amended Complaint, incorporating the allegations made

in their First Counterclaim (Dkt 26 at 2).

        Both parties subsequently proposed filing motions for injunctive relief, and this Court held

a Pre-Motion Conference on June 22, 2009. The Court issued a briefing schedule on Defendants'

motion and held a briefing schedule on Plaintiffs' motion in abeyance (Dkt 25). On August 31,

2009, the parties filed their motion briefs (Dkts 31, 33 & 34). Defendants sought to apply IDEA's

"stay-put" provision, 20 U.S.C. § 1415(j), to have T.W. return to school under the terms of the May

2007 IEP. However, as counsel for both sides indicated that T.W. continues to receive private

educational services (Dkt 134, 9/27/2010 Hr'g Tr at 15, 24), there was no need for the Court to resolve the academic question of his "then current educational placement."[1]

Instead, from the outset of this case, the Court has attempted to persuade T.W.'s parents and educators that their time and resources would be more fruitfully spent on achieving a negotiated settlement of their differences than on amassing more transcripts and exhibits in their quest for an administrative solution and judicial imprimatur.[2] On November 17, 2009, this Court issued an Order appointing a mediator well-versed in special education alternative dispute resolution (Dkt 42). This Court's Order also provided a briefing schedule for the parties' proposed dispositive motions, should mediation be unsuccessful (*id.*). On January 16, 2010, the parties met with the mediator (Dkt 95). On March 10, 2010, after providing further information and exchanging proposals, the parties filed a Joint Status Report, indicating that their attempt to achieve a mediated settlement was unsuccessful (Dkt 96). Plaintiffs subsequently initiated a new due process hearing request in the SOAHR, agency no. SEH 10-24, challenging a June 6, 2008 IEP. The June 6, 2008 IEP is not before this Court.

On January 15, 2010, this Court received the official Administrative Record in this case: 32 transcript volumes, 361 exhibits, and the briefs the parties submitted to the IHO, i.e., thousands of pages addressing T.W.'s academic, social, and emotional progress at Northport Public School during the time period covered by this dispute (Dkts 44-92). Plaintiffs filed a Motion to Supplement Record with Additional Evidence (Dkt 97), which this Court denied May 27, 2010 (Dkt 117).

---

[1]In any event, the question is now moot because any injunctive relief this Court could have properly issued would have ceased to be effective on the entry of an order concluding this case.

[2]Plaintiffs also initiated another proceeding in this Court, 1:09-cv-855, in September 2009, raising eight claims against these defendants and others, ranging from retaliation to civil conspiracy. That case was eventually closed on August 18, 2010.

On May 20, 2010, the parties filed their cross-motions (Dkts 103-115). In their Motion for Judgment on the Administrative Record pursuant to FED. R. CIV. P. 12(c), Defendants argue that the IHO's Decision and Order should be reversed because the IHO "failed to comply with the IDEA-based limitation on her authority and awarded excessive substantive remedies in response to what were, at most, minor procedural violations of [the Act]" (Dkt 107 at 5). Plaintiffs filed a response to Defendants' motion (Dkt 106), and Defendants filed a reply (Dkt 111). Plaintiffs filed a "Cross-Motion for Summary Judgment or Alternatively Judgment on the Administrative Record" (Dkt 104). Plaintiffs, while in overall agreement with the IHO's findings that T.W. was denied a FAPE for two years, contend that the IHO nonetheless committed several errors, primarily by failing to provide Plaintiffs their "complete" relief. Defendants filed a response (Dkt 108), and Plaintiffs filed a reply (Dkt 109). Having fully considered the parties' motion briefs, the Court determines that oral argument is unnecessary to resolution of this matter. *See* W.D. Mich. LCivR 7.2(d).

## II. APPEAL FROM THE IHO'S DECISION AND ORDER

### A. Jurisdiction

This Court has original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The IDEA provides that any party aggrieved by the findings and decision of a state-level due process hearing or local-level due process hearing shall have the right to bring a civil action in a district court of the United States, without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2)(A). Both sides in this case have properly appealed to this Court from various portions of the IHO's Decision and Order.

### B. Standard of Review

The IDEA mandates that a district court, reviewing an IHO's decision, "(*i*) shall receive the records of the administrative proceedings; (*ii*) shall hear additional evidence at the request of a party; and (*iii*) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "'The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process.'" *Board of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 312 (6th Cir. 2007) (quoting *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004)). The Sixth Circuit Court of Appeals characterizes the standard as a "modified de novo standard," meaning that the district court "may set aside administrative findings in an IDEA case 'only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.'" *Fayette Cnty.*, 478 F.3d at 312-13 (quoting *Berger v Medina City Sch. Dist.*, 348 F.3d 513, 519 (6th Cir. 2003)).

This Court's two-fold inquiry is to determine (1) whether the state complied with the procedures set forth in the Act, and (2) whether the IEP developed pursuant to these procedures is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 207; *accord Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 729 (6th Cir. 2003).

The modified de novo standard of review applies to both procedural and substantive matters. *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). "With regard to

procedural matters, a court should 'strictly review an IEP for procedural compliance,' although technical deviations will not render an IEP invalid." *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 609 (6th Cir. 2006) (quoting *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)). A finding of procedural violations does not necessarily entitle appellants to relief. *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). Only if a procedural violation has resulted in substantive harm, and thus constitutes a denial of a FAPE, may relief be granted. *Id.* With regard to substantive matters, the second prong of *Rowley*, the court is required to determine whether the IEP at issue is "reasonably calculated to enable the [student] to receive educational benefits." 458 U.S. at 206-07. "[T]he IDEA requires an IEP to confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue." *Deal*, 392 F.3d at 862. "Only by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement." *Id.* at 864.

The IDEA defines FAPE as "special education and related services that – (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of this title." 20 U.S.C. § 1401(9). The Sixth Circuit Court of Appeals has held that an IEP provides a FAPE when: "(1) the state has complied with the procedures set forth in the IDEA and (2) the IEP developed through the procedures is reasonably calculated to enable the child to receive educational benefits." *Dong*, 197 F.3d at 800 (citing *Rowley*, 458 U.S. at 206-07).

The Supreme Court has cautioned that "[i]n assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley*, 458 U.S. at 207 (footnote omitted). "The 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206).

"Indeed, federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 566 (6th Cir. 2000); *see Metro. Bd. of Pub. Educ. v. Guest ex rel. Guest*, 193 F.3d 457, 462 (6th Cir. 1999) (noting that federal courts "are given the benefit of expert factfinding by a state agency devoted to this very purpose") (quoting *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989)). While the district court is always required to give due deference to administrative findings in an IDEA case, even greater weight is due to the determinations on matters for which educational expertise is relevant. *Deal*, 392 F.3d at 865.

## C. Analysis

In their Counterclaim and in their motion at bar, Defendants contend that the IEPs at issue provided T.W. with a FAPE because they were reasonably calculated to deliver educational benefit and T.W. made progress. Defendants argue that "[r]ather than focusing on whether the IEPs were

reasonably calculated to deliver educational benefit at the time of their creation," the IHO inappropriately focused, in hindsight, on T.W.'s progress (Dkt 107 at 6). Defendants argue that the IHO "ignored the testimony and evidence that T.W. made meaningful progress" and that the IHO "failed to gauge T.W.'s progress to his potential" (*id.* at 7-8). Indeed, Defendants opine that because the IHO misapplied the substantive prong of the *Rowley* standard and erred in concluding that the IEPs at issue were not reasonably calculated to deliver educational benefit to T.W., the IHO awarded "draconian and excessive remedies" (*id.* at 5-8, 22-26).

In their Count III, Plaintiffs similarly challenge "select portions" of the IHO's Decision and Order (Dkt 4 at 23). Plaintiffs, while in overall agreement with the IHO's decision that T.W. was denied a FAPE for two years, argue that the IHO failed to decide the issues before her "with finality" and failed to provide "complete" relief (Dkt 105 at 16-26).

The Court will address each of these issues in turn, synthesizing the parties' overlapping arguments as follows. Ultimately, the Court agrees with Plaintiffs that they succeeded in demonstrating certain failures by Defendants in properly implementing the 2006-07 and 2007-08 IEPs. Accordingly, the Court denies Defendants' Counterclaim and finds in favor of Plaintiffs on Count III of their First Amended Complaint.

1.      **2006-07 IEP**

    a.      ***Resource Program Services***

Defendants challenge the IHO's decision about the manner in which Defendants executed the resource program services required by T.W.'s 2006-07 IEP, an execution Plaintiffs claimed below was a substantive denial of a FAPE (Admin. Record, Pls.' Post-Hr'g Br. at 93). T.W.'s 2006-07 IEP required the service "Elem. Resource Room" for a specified duration of "20-30 mins/day"

(Admin. Record, Joint Ex. 2-11). The IHO found that the credibility of T.W.'s resource program provider, Laura Jones, was "compromised" by her disparate versions of how the resource program services indicated in the 2006-07 IEP were provided and by the conflicts between her service records and the records of T.W.'s aide, Bonnie Huck (Admin. Record, IHO Dec. & Order, pp 48-57). The IHO found that Defendants had not provided the resource room program services, direct or consultative, that were indicated in the 2006-07 IEP (*id.*). From these findings, the IHO concluded that Plaintiffs showed, by a preponderance of the evidence, that Defendants did not comply with the requirements of the 2006-07 IEP in that the resource program services were not implemented (*id.* p 136-37, Conclusions of Law ¶ 13). The IHO concluded that it was a "substantial and significant aspect[] of the IEP that went wholly unimplemented" (*id.*).

Defendants opine that in reaching her conclusions, the IHO unfairly and improperly imputed to Defendants the conduct of the resource program provider in violating the sequestration order and that the IHO "punished [Defendants] with an award of compensatory education that has no support in the record" (Dkt 107 at 12). Defendants assert that they "implemented the resource program portion of the IEP by providing the services as push-in services" (*id.* at 12-13), i.e., "by pushing support from the resource teacher into the general education setting" (Admin. Record, Defs.' Post-Hr'g Br. at 52). Defendants assert that they provided "roughly 5,400 minutes of resource program services" (Dkt 107 at 7). In response, Plaintiffs contend that Defendants are using a three-year window to aggregate and overvalue the number of hours of instructional support provided, thereby engaging in a misleading effort to cover their failures (Dkt 106 at 20).

The 2006-07 IEP does not require "push-in services" but "Elem. Resource Room" services. Plaintiff Gerald Wood testified that it was Plaintiffs' understanding that T.W. would spend time

away from his regular classroom in the resource room location (Admin. Record, Hr'g Tr. Vol. XXV, pp 5399-5401). Coupled with the credibility problems the IHO reasonably found related to Jones' testimony about the delivery of resource program services, the record supports the IHO's findings and conclusions of law. The Court holds that the IHO's decision is justified based on the agency's presumed educational expertise and a fair estimate of the worth of the testimony in the record. *See Berger*, 348 F.3d at 519 (quoting *Burilovich*, 208 F.3d at 567). Defendants' argument again does not provide this Court with a basis upon which to reverse the IHO's conclusion that Defendants did not comply with this requirement of the 2006-07 IEP.

   **b.**   ***Physical Therapy***

Defendants next challenge the IHO's decision concerning the physical therapy portion of the 2006-07 IEP. The IHO found that the 2006-07 IEP required 30 minutes per month of indirect or consultative physical therapy services for a total of 4 hours (Admin. Record, IHO Dec. & Order, pp 40-41). The IHO determined that while Powell's investigation of a tripping concern could reasonably account for one and one-half hours, "2 1/2 hours are not accounted for and, effectively, were not provided" (*id*. p 41).

Defendants argue that they provided the amount of consultative physical therapy required under the 2006-07 IEP and that the IHO erred in not requiring Plaintiffs to prove that the services were *not* provided (Dkt 107 at 14). Plaintiffs respond that the IHO properly drew an inference from the contents of the PT logs that was unfavorable to Defendants, namely, that Defendants failed to provide the amount of consultative physical therapy required under the 2006-07 IEP (Dkt 106 at 26).

Defendants' argument is, specifically, that the IHO "improperly shifted the burden of proof" to them. Defendants' argument fails for the simple reason that it overlooks the fact that the burden-

of proof concept encompasses both "the 'burden of persuasion,' i.e., which party loses if the evidence is closely balanced, and the 'burden of production,' i.e., which party bears the obligation to come forward with the evidence at different points in the proceeding." *Schaffer*, 546 U.S. at 56 (citing *Director, Office of Workers' Comp. Programs v. Greenwich Collieres*, 512 U.S. 267, 272 (1994)). Although Plaintiffs, the party seeking relief, bore the burden of persuasion, Defendants had an independent obligation to submit a factual record indicating that they conscientiously carried out their statutory obligation. Defendants' argument reveals no legal or factual error by the IHO.

      **c.**      ***In-house Autism Teacher Consulting Services***

Defendants' next argument concerns the manner in which Defendants executed the in-house autism teacher consultant services required in the 2006-07 IEP. The IHO determined that (1) the case load of the pertinent staff person, Norm Bistodeau consisted of 80 to 90 students, which exceeded the "not more than 25 students" maximum permitted by state regulation; and (2) that Bistodeau offered each student the same minimum amount of contact time "regardless of the amount of time any individual child has needed or is reasonably likely to need such services" (Admin. Record, IHO Dec. & Order, pp 42, 45-46).

Defendants argue that they provided the amount of in-house autism teacher consulting services in the 2006-07 IEP inasmuch as the relevant state regulation requires only that a teacher consultant "be available" to the program (Dkt 107 at 15). Plaintiffs respond that the IHO properly determined that the services of the in-house autism teacher consultant did not meet T.W.'s unique and significant needs (Dkt 106 at 26-27).

Defendants' argument is simply without merit. The IHO considered Defendants' construction of the regulation and properly concluded, based on the record, that Plaintiffs were

correct in asserting that the teacher consultant was, in fact, "not available" because his total caseload so greatly exceeded the maximum permitted under Michigan's administrative rules (Admin. Record, IHO Dec. & Order, pp 46-47). The IHO's determination that Defendants did not provide these required services is justified based on the both the IHO's presumed educational expertise and a fair estimate of the worth of the testimony in the record.

### d. *Assistive Technology Evaluation*

Defendants' last argument arising from the 2006-07 IEP is that the IHO erred in finding that they failed to timely complete an assistive technology (AT) evaluation required by the 2006-07 IEP. "Assistive technology device means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability." 34 C.F.R. § 300.5.

The 2006-07 IEP required an "AT evaluation (with parental input) by 11/21st/06" (Admin. Record, Joint Ex. 2-7). The IEP further indicated that an "addendum will be held after evaluation by December 1st, 2006" (*id.*). The IHO determined that Defendants "did not conform to the time line for completing this evaluation whether it is controlled by the regulatory time frame or the time frame specified in the IEP" (IHO Dec. & Order, pp 60-61).[3]

Defendants argue that the IHO erred in finding that they failed to timely complete an assistive technology evaluation because the process was "ongoing" and "many of the technology devices and services were in place" (Dkt 107 at 17). However, as Plaintiffs point out in response (Dkt 106 at 27-28), Defendants cannot avoid their responsibility to timely complete the AT

---

[3]The IHO also found that the AT evaluation did not address the need Plaintiffs identified, to wit: T.W.'s inability to read (IHO Dec. & Order, pp 59-61), a finding Defendants do not challenge.

evaluation as required by the 2006-07 IEP by simply claiming the evaluation was an "ongoing evaluation." The Court agrees with the IHO's determination that Defendants failed to timely complete the AT evaluation as required.

**2. 2007-08 IEP**

   **a.   *Parental Participation***

Turning to the arguments arising from the 2007-08 IEP, Defendants contend that the IHO erred in determining that Plaintiffs were denied meaningful participation at the IEP Team meetings in April and May 2007 (Dkt 107 at 8-9). IDEA regulations require that "[e]ach public agency must take steps to ensure that one or both of the parents of a child with disability are present at each IEP Team meeting or are afforded the opportunity to participate[.]" 34 C.F.R. § 300.322(a); *see also* 20 U.S.C. § 1414(d)(1)(B) (defining an IEP team to include the child's parents). "If neither parent can attend an IEP Team meeting, the public agency must use other methods to ensure parent participation, including individual or conference telephone calls." 34 C.F.R. § 300.322(c). Parental participation "'must be *meaningful.*'" *Nack*, 454 F.3d at 610 (quoting *Deal*, 392 F.3d at 858).

In this case, the IHO found that the lack of parental input at IEP team meetings in April and May 2007 reflected "poor conduct" by both sides but no procedural error resulted from the conduct (Admin. Record, IHO Dec. & Order, pp 74-78). However, the IHO also found that "no academic goals [were] proposed, revealed or drafted while the team was in session" (*id.* p 78). Specifically, the IHO found that the academic goals were not addressed because Defendants "would not approach the inquiry" (*id.* at 79). The IHO concluded that Defendants had denied Plaintiffs meaningful participation and committed clear procedural error "[1] where respondent's representative arranged to have staff members write academic goals on the IEP form *after* the meeting had concluded, [2]

where petitioners had explicitly inquired about these goals being developed as a part of the IEP meeting, and [3] when respondent implemented the IEP with the academic goals without gaining any input from petitioner-parents on the goals" (*id.*, p 138, Conclusions of Law ¶ 20).

Defendants did not dispute below, nor do they dispute here, that Plaintiffs raised the need for the academic goals *during* the 2007 IEP meetings and that the academic goals were nonetheless written *after* the IEP meetings. Defendants' argument on appeal is instead that the IHO erred in determining that this factual scenario leads to the legal conclusion that Plaintiffs were denied meaningful participation in the development and implementation of the IEP (Dkt 107 at 9). Defendants point out that Plaintiffs attended IEP meetings, participated in the decisions made at those meetings, and received "almost-daily" communication from the district staff (*id.*).

A statement of measurable annual goals, including academic and functional goals, is a statutory requirement of an IEP. 20 U.S.C. §1414(d)(1)(A). The Court agrees with the IHO that Defendants' failure to address the academic goals during the IEP meetings violated its obligation under 34 C.F.R. § 300.322. That Plaintiffs were present at the meetings, participated in other decisions made at those meetings, and received "almost-daily" communication from the district staff does not ameliorate this particular infringement on the parents' opportunity to participate in the IEP process. *See generally Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1190-91 (6th Cir. 1990) (discussing congressional emphasis upon full participation of concerned parties throughout the development of the IEP). The IHO's conclusion that this procedural error occurred is not one the Court is persuaded to reverse.

**b.** ***Present Level of Academic Achievement and Functional Performance***

The next alleged error Defendants put forward for review concerns the IDEA's requirement that an IEP include, among other things, "a statement of the child's present levels of academic achievement and functional performance" and "a statement of measurable annual goals, including academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i)(I) & (II). *See also* 34 C.F.R. § 300.320(a)(1) & (2).

Here, the IHO found that the portion of the 2007-08 IEP related to T.W.'s Present Level of Academic Achievement and Functional Performance (PLAAFP) was deficient inasmuch as it omitted (1) information about T.W.'s behavior; (2) information from independent evaluators regarding recommendations for direct therapy, instructional material or curricula, assistive technology devices and learning environment; and (3) information regarding T.W.'s upper extremity range of motion, tripod grasp, and gait (Admin. Record, IHO Dec. & Order, pp 85-86). Further, the IHO found that the portion of the 2007-08 IEP stating the annual academic and functional goals for T.W. was "below par" and created a "deplorable obstruction to the IEP team's efforts to plan or provide an adequate program" for T.W. (*id.* pp 93-94). From these findings, the IHO concluded that the 2007-08 IEP is deficient because "PLAAFP information is contradictory and does not provide concrete quantified information to define the student's baseline abilities for goals development, the written goals and objectives also lack baseline data, are imbued with ambiguity and lack ascertainable criteria for judging progress" (*id.* p 139, Conclusions of Law ¶ 24).

Defendants argue that in finding deficient the PLAAFP portion of the 2007-08 IEP, the IHO erred by "completely ignor[ing] the voluminous testimony and evidence" regarding Defendants' efforts to include Plaintiffs "both within and outside of the IEP process" (Dkt 107 at 10). Conversely, Defendants also argue that the IHO erred in "fly-specking and second-guessing the

content, measurability and appropriateness of the goals and objectives" (Dkt 107 at 11). Defendants contend that even if shortcomings were present, the shortcomings would constitute only procedural technical violations like those identified in *Winkelman v. Parma City Sch. Dist.*, 411 F. Supp. 2d 722 (N.D. Ohio 2005), *aff'd,* 294 F. App'x 997 (6th Cir. 2008) (*id.*).

In response, Plaintiffs argue that the IHO's strict review of the IEP was proper (Dkt 106 at 12, 23). Plaintiffs opine that Defendants mischaracterize the IHO's analysis as "flyspecking" (*id.* at 23). Further, Plaintiffs emphasize that while "'minor technical violation[s]' may be excused . . . , the failure to provide objective criteria for measuring [a] [s]tudent's progress . . . cannot be excused as a 'mere technical matter,'" particularly here, where, Plaintiffs allege, the district "hid information" from them (*id.* at 24).

The factual context in *Winkelman* precludes Defendants' argument that the shortcomings the IHO identified here are like the "procedural technical violations" identified in *Winkelman.* In *Winkelman,* 411 F. Supp. 2d at 731, the lack of goals and objectives for occupational therapy constituted only a "procedural technical violation of the IDEA and not reversible error" because the student was entering a completely new school setting. *See also Doe*, 898 F.2d at 1191 (the identified shortcomings were considered technical violations because "the information absent from the IEP was nonetheless known to all parties").

The factual context of this case is more akin to *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss ex rel. Boss*, 144 F.3d 391 (6th Cir. 1998), where the IEP did not include "appropriate objective criteria for measuring [the child's] progress," *id.* at 398, and contained only "vague and general statements," *id.* at 394 n.1. The Sixth Circuit Court of Appeals in *Boss* concluded that these violations were "far from technical" and "not harmless" because "[t]he omission went to the heart

of the substance of the plan." *Id.* at 399. Here, too, the IHO concluded that the 2007-08 IEP is substantively deficient where the PLAAFP information and the written goals and objectives are ambiguous and lack ascertainable criteria for judging T.W.'s progress. Defendants' argument provides no basis for reversing the IHO's conclusion, especially under the standard of review the Court is required to apply, "which militates against second guessing the educational expertise of the administrative officers and conclusions predicated upon these [sic] expertise." *See id.* (citing *Doe*, 133 F.3d at 386).

      **c.**      ***Access to Evaluation Protocols***

Defendants' next argument concerns the IHO's findings and conclusions regarding Plaintiffs' access to Defendants' evaluation protocols. The IHO found that Defendants' handling of Plaintiffs' August 2006 requests for copies of Defendants' evaluation protocols was "suspect" and "demonstrate[d] that accountability and accuracy and fair dealing were laid aside" (Admin. Record, IHO Dec. & Order, pp 61-70). The IHO concluded that Defendants' mishandling of Plaintiffs' requests did not impede Plaintiffs' ability to participate in the spring 2007 IEP process so as to result in a denial of FAPE, but the mishandling justified declaratory relief for a procedural error (*id.* at 70).

Defendants argue that the IHO erred in concluding that Defendants violated Plaintiffs' rights regarding access to Defendants' evaluation protocols where Defendants sent the protocols by registered mail to Plaintiffs' expert and Plaintiffs' expert conceded that he failed to retrieve his mail (Dkt 107 at 13). Plaintiffs respond that the IHO properly found that Defendants denied them their right to review T.W.'s complete school record, including the evaluations administered to T.W. where (1) Defendants first "refused to provide the protocols to [Plaintiffs], claiming they were not properly certified to receive them"; (2) then sent the test protocols to only one person – Dr.

Milanovich, even though Plaintiffs had retained two sets of certified professionals to review the protocols; and (3) when the documents were returned to Defendants due to addressing errors, "[Defendants] took no action to inform [Plaintiffs]" (Dkt 106 at 25).

Although Defendants clearly disagree with the IHO's conclusion, Defendants have not demonstrated that the IHO's findings, given due deference, do not reasonably lead to the conclusion that a procedural error occurred.

### d. *Elimination of Special Education Academic Programming*

The last portion of the 2007-08 IEP challenged by Defendants concerns the reduction of autism teacher consultant sessions (from 6-8 sessions per school year to 4-6 sessions per school year) and the elimination of resource program services (IHO Dec. & Order, pp 101-102, Findings of Fact, ¶¶ 211, 213). The IHO found the decrease in the autism teacher consultant services and the discontinuation of the resource program services "troubling" because "the IEP team in May of 2007 explicitly and repeatedly referenced Student's need for 1:1 instruction" (*id.* pp 115-116). The IHO therefore determined that "[t]he academic program proposed for Student for the 2007-2008 school [year] was ... insufficient to afford him a FAPE because it was not reasonably calculated to provide him meaningful educational benefit as gauged against his individual potential" (*id.* p 116).

Defendants argue that elimination of resource programming in the 2007-08 IEP was the "least restrictive environment" and was consistent with Plaintiffs' "historic refusal" of pull-out special education services (Dkt 107 at 15). Defendants also argue that "a [o]ne-to-[o]ne ASD teacher was never requested and [is] inappropriate for T.W." (Dkt 107 at 23). Defendants request that this Court either uphold the IEP as proposed in May 2007 or order the IEP amended to add the resource program Defendants have previously offered Plaintiffs (*id.*). Defendants argue that

Plaintiffs presented no evidence or testimony to support the IHO's award (Dkt 107 at 24). Defendants opine that the IHO's award "is based upon multiple errors of fact and law, un-justly [sic] punishes [Defendants], and is contrary to T.W.'s educational interests" (Dkt 107 at 24-25).

Plaintiffs argue that "[t]he IEP team's decision to eliminate the special education academic programming in the May 2007 IEP was contrary to the [p]arents' wishes and denied T.W. a FAPE" (Dkt 106 at 27). Plaintiffs claim that they "did not object to [T.W.] being removed from the regular education classroom in order to receive special education academic support in the Resource Room" and that the opposite was in fact true (*id.*). Plaintiffs argue that a one-to-one teacher with AI certification is an appropriate form of relief to compensate T.W. for the denial of an appropriate education (Dkt 106 at 31-32).

The parties' disagreement on this issue, which concerns a matter for which educational expertise is relevant, particularly implicates the requirement that this Court give "even greater weight" to the IHO's determinations. *See Deal,* 392 F.3d at 865. Also particularly relevant is this Court's prior conclusions that Defendants did not comply with either the resource room services requirement or the autism teacher consultant services requirement of the 2006-07 IEP. *See supra* Section II. C. 1. a & c. Considering the record and affording the IHO's determinations great weight, the Court is not persuaded that Defendants' argument reveals any error in the IHO's conclusion that the 2007-08 IEP denied T.W. a FAPE. Rather, the Court agrees with the IHO's conclusion that "[a]n IEP that decreases instructional support services to a child with a disability who has previously been denied promised services and who has not progressed in the general curriculum is not reasonably calculated to provide meaningful educational benefit as required by IDEA" (Admin. Record, IHO Dec. & Order, p 140, Conclusion of Law ¶ 26).

3.      **"Hostile Environment"**

a.      *Plaintiffs' Claim*

In Count II of their First Amended Complaint, Plaintiffs argue that Defendants created a "hostile and poisoned educational environment" that prevented their meaningful participation in T.W.'s educational planning and monitoring (Dkt 4 at 20-22). The IHO rejected this argument, finding that the adults on both sides of this case managed to hold the student "above the fray" (Admin. Record, IHO Dec. & Order, pp 116- 26). The IHO concluded that Plaintiffs had not established, by a preponderance of the evidence, that a "hostile environment" exists so as to preclude T.W. from receiving FAPE or to prevent them from participating in IEP matters (*id.* p 140, Conclusions of Law, ¶ 27).

On appeal to this Court, Plaintiffs contend that the IHO properly found the indices of a hostile environment but erroneously applied the incorrect legal standard to deny the claim (Dkt 105 at 25-26). Specifically, Plaintiffs reject the IHO's determination that "[t]he gravamen of a hostile environment claim under IDEA . . . is that the animus or hostility must imperil the *student's* access to and likelihood of success in the placement" (Dkt 105 at 26; IHO Dec. & Order, p 126). Plaintiffs assert that Defendants' "substantial, repeated and pervasive actions . . . in violation of the [*parents'*] rights . . . causes a hostile . . . environment to exist between these parties," dooming future IEPs to failure (Dkt 105 at 26) (emphasis added).

In response, Defendants point out (1) that Plaintiffs did not put forth their hostile-environment claim until more than 120 calendar days into the due process hearing; (2) that Plaintiffs fail to provide any reason or support for extending sexual-harassment-in-the-workplace analysis to whether T.W. received a FAPE; and (3) that the IHO properly found based on the evidence in the

record that the environment at Northport Public School was neither hostile nor poisoned to T.W. or his parents (Dkt 108 at 14-23).

In making their argument, Plaintiffs attempt to analogize to a Title VII hostile environment claim, *see, e.g., Williams v. Gen. Motors*, 187 F.3d 553 (6th Cir. 1999), and the Seventh Circuit Court of Appeal's discussion of parental hostility present in *Board of Educ. v. Illinois State Bd. of Educ. and Brozer*, 938 F.2d 712 (7th Cir. 1991) (concluding that the district court, in analyzing the educational benefits that could be expected to flow from the child's placement, did not err in considering as a factor the parents' hostility to their son's placement) (Dkt 105 at 25-26).

Plaintiffs' argument presupposes a hostile-environment theory that has not yet been recognized or addressed by the Sixth Circuit Court of Appeals within the IDEA context. Hence, Plaintiffs' arguments about the "proper indices" or "gravamen" of an IDEA-hostile environment theory are arguments that are difficult to analyze, given the absence of any applicable case law. Even assuming the legal propriety of Plaintiffs' theory, Plaintiffs' arguments lack merit inasmuch as they depend upon a factual mischaracterization of the IHO's conclusion. The IHO examined not only whether the alleged animus or hostility imperiled the *student's* access to and likelihood of success in the placement but also whether the alleged hostile environment prevented the *parents* from participating in IEP matters (IHO Dec. & Order, p 140, Conclusions of Law ¶ 27). Moreover, although the IHO found that determining the academic goals outside the IEP process constituted clear procedural error, the IHO also found that the "poor conduct" by both sides at the April and May 2007 IEP team meetings did not rise to the level of a procedural error (IHO Dec. & Order, pp 77-79). The latter finding contradicts Plaintiffs' argument that Defendants created a "hostile and poisoned educational environment" preventing their meaningful participation in T.W.'s educational

planning and monitoring. In short, Plaintiffs' hostile-environment claim was properly rejected by the IHO, and this Court likewise enters Judgment against Plaintiffs on Count II of their First Amended Complaint.

### b. *Plaintiffs' Requested Remedy*

In the section of the Decision and Order titled "Prospective Reimbursement a.k.a. Monetary Damages," the IHO denied Plaintiffs' request for money damages "equal to the amount they [were] likely to expend to allow [T.W.] to recover from the educational loss suffered" (Admin. Record, IHO Dec. & Order, p 127). The IHO determined that Plaintiffs' request was for a remedy premised on their hostile environment claim, which the IHO rejected for the reasons previously discussed (*id.*). Plaintiffs now challenge the IHO's failure to reimburse them for their "retroactive and prospective compensatory education expenses" (Count V, Dkt 4 at 38-40) and the IHO's decision to instead "condition" the award of certain compensatory services on T.W.'s re-enrollment in Northport Public School (Count IV, *id.* at 33-38).

Specifically, Plaintiffs assert that "the requested relief was *not* for money damages but to require [Defendants] to provide funding to allow the Parents to purchase appropriate prospective compensatory educational services to be delivered by private service providers to the Student in the private educational placement" (First Amend. Compl. ¶ 125, Dkt 4 at 38). Citing *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912 (6th Cir. 2000), where the Sixth Circuit examined the plaintiff's claim for money damages under 42 U.S.C. § 1983, Plaintiffs opine that they "should be reimbursed for the expenses they have and continue to incur in privately obtaining compensatory education for their child"(Dkt 105 at 24-25).

In response, Defendants argue that the IHO properly refused to grant public school funding of any retrospective or prospective privately-purchased services because (1) Plaintiffs did not provide the statutorily required notice that they intended to remove T.W. and place him privately at public expense, 20 U.S.C. § 1412(a)(10)(C)(iii)(I) (Dkt 108 at 4-9); (2) Plaintiffs did not identify this remedy until after the IHO permitted the hostile environment claim to be added to this case (*id.* at 2); (3) Plaintiffs did not offer any testimony or evidence regarding the nature of the private services provided (*id.* at 9-11); and (4) Plaintiffs are not entitled to public funding of a private placement because Defendants have provided, and can continue to provide, T.W. with a FAPE in the least restrictive environment (*id.* at 11-14).

In reply, Plaintiffs assert that in addition to the IHO mischaracterizing their request below as one for money damages, Defendants now mischaracterize their request as one for a district-funded private placement under 20 U.S.C. § 1412(a)(10)(C) (Dkt 109 at 4).  Plaintiffs explain that because they are requesting funds for private *services*, not a private *placement*, the statutory notice requirements are inapplicable (*id.* at 7).  Plaintiffs also explain that the information regarding T.W.'s private program is not part of the administrative record because it was not put into place until September 2008, i.e., after the hearing record was closed (*id.* at 8).

Plaintiffs assert that "[a]s in *Lewis Cass* [*Intermediate Sch. Dist. v. M.K. ex rel. J.K.*, 290 F. Supp. 2d 832, 838 (W.D. Mich. 2003),] [they] are requesting that the Court order the District to place sufficient funds in trust so they may contract with private entities to fulfill the District's obligation to provide compensatory education services" (*id.* at 5).  In an argument in their cross-motion, which arises from their related claim in Count IV, Plaintiffs argue that such a "private delivery" system is warranted because the IHO erred in creating the re-enrollment requirement as

a condition precedent to the delivery of a large portion of the compensatory educational services (Dkt 105 at 20-24).

The confusion over Plaintiffs' reimbursement claim is understandable. However, to the extent Plaintiffs previously indicated that they were requesting reimbursement for a private placement, Plaintiffs' reply brief establishes that they have effectively withdrawn that request (Dkt 109 at 7), thereby removing analysis of this issue from the statutory notice framework set forth in *Berger*, 348 F.3d at 519-26.

To the extent Plaintiffs previously indicated that they were requesting money damages as a remedy for their hostile-environment claim, the IHO properly rejected their request, for the reasons previously stated. *See supra* Section II. C. 3. a. The Sixth Circuit's decision in *Covington* does not require a different conclusion. The legal issues in the two cases are not the same. In *Covington,* the legal issue was the exhaustion requirement, if any, for the plaintiff to bring her claim for money damages under 42 U.S.C. § 1983 for injuries suffered by her disabled son, whereas the issue here is the propriety of awarding money damages. Moreover, the facts of this case, which concerns a voluntary removal from school, differ from the facts in *Covington,* where "the injured child ha[d] already graduated from the special education school, his injuries [were] wholly in the past, and therefore money damages [were] the only remedy that [could] make him whole." 205 F.3d at 917.

To the extent Plaintiffs now indicate that they are requesting a trust account "as in *Lewis Cass,"* this request is not well supported by the case upon which Plaintiffs rely. In *Lewis Cass,* the district court decided that a student who requested a due process hearing after moving out of the school district was nonetheless entitled to a due process hearing. *Lewis Cass,* 290 F. Supp. 2d at 839. In so deciding, the district court added the footnote that Plaintiffs here quote, in which the

court rejected the school district's "concern that providing compensatory services to a[n] [out-of-state] student in Indiana [would] be impractical if not impossible" because the school district was able to provide such services to an out-of-district student either by "contracting with the student's new resident district (even if in another state) or a private entity near the student in order to fulfill its [IDEA] obligations." *Lewis Cass*, 290 F. Supp. 2d at 838-39 n.3. This footnote surmises a contractual relationship between the school and another entity, either another school or a private entity. The footnote does not address, let alone support, the establishment of a "trust account" or "private delivery system" that Plaintiffs at bar seek to fund services they have unilaterally procured.

In sum, Plaintiffs' argument does not demonstrate any error by the IHO on this money damages/reimbursement issue that requires reversal by this Court. Rather, this Court will enter Judgment against Plaintiffs on Counts IV and V of their First Amended Complaint.

**4.     Plaintiffs' Request for Attorney Fees & Costs**

In Count I of their First Amended Complaint, Plaintiffs request reimbursement of their attorney fees and costs (Dkt 4 at 16-20; Dkt 105 at 28-31). In most civil litigation, the parties are responsible for paying their own attorney fees and costs. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Under this "American Rule," courts follow "a general practice of not awarding fees to a prevailing party absent explicit statutory authority." *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994). In the IDEA, Congress provided that "[i]n any action or proceeding brought under this section, the court, in its discretion, *may* award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability. . . ." 20 U.S.C. § 1415(i)(3)(B)(*i*)(I) (emphasis added).

In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court held that, to be entitled to attorney fees, a plaintiff must first qualify as a "prevailing party." *Id.* at 433 (construing 42 U.S.C. § 1988); *see also Wikol ex rel. Wikol v. Birmingham Pub. Sch. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004) (explaining that "[t]he IDEA's fee-shifting provision is to be interpreted consistent with 42 U.S.C. § 1988"). Once the prevailing-party requirement is met, then the district court must determine what fee is "reasonable." *Id.*

"Plaintiffs may be considered 'prevailing parties' for purposes of attorney fees 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Berger*, 348 F.3d at 526 (quoting *Hensley*, 461 U.S. at 433). "The touchstone of the prevailing party inquiry [is] . . . the material alteration of the legal relationship of the parties . . ." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989).

Plaintiffs assert that they substantially prevailed on the three core issues they brought forward for resolution by the IHO – (1) that Defendants "failed to provide services specified in the October 2006 IEP and the Oct. 2005 Settlement Agreement"; (2) that Defendants "denied both T.W. and his parents many of the significant procedural rights contained in IDEA and those denials resulted in a loss of educational opportunity for [T.W.]" and a loss of separate rights for Plaintiffs; and (3) "that the May 2007 IEP, as proposed by [Defendants], substantively denied T.W. a FAPE as it failed to provide him with 'meaningful educational benefit'" (Dkt 105 at 28, 30). Plaintiffs assert that they should therefore be deemed the "prevailing party" and should receive full reimbursement for their attorney fees and costs related to successful enforcement of their rights (*id.* at 28).

In response, Defendants first contend that the IHO "denied literally dozens of issues upon which Plaintiffs failed to prevail and those issues have not been appealed to this Court" (Dkt 108 at 21). Defendants request that this Court, when evaluating Plaintiffs' prevailing-party claim, "compare the number of issues raised by Plaintiffs and the extent to which they prevailed and received substantive relief" (*id.*).

Defendants' suggested approach for this Court's analysis is ill-advised. In *Hensley*, the Supreme Court forbid a mathematical approach comparing the total number of issues in the case with those actually prevailed upon, opining that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." 461 U.S. at 435 n.11 (citation omitted). The Sixth Circuit Court of Appeals has also likewise "repeatedly rejected mechanical reductions in fees based on the number of issues on which a plaintiff has prevailed." *Deja Vu of Nashville v. Metro. Gov't of Nashville and Davidson Cnty.*, 421 F.3d 417, 423 (6th Cir. 2005). Further, the Sixth Circuit has held that "attorney-fees awards should be analyzed on a case-by-case basis, without attempting to apply any predetermined formula." *Wikol*, 360 F.3d at 611.

More helpful is Defendants' argument that reimbursement of attorney fees is not warranted in this case because Defendants offered Plaintiffs many of the remedies the IHO ultimately ordered and Plaintiffs refused to either voluntarily reduce the issues or dismiss those issues that were moot (Dkt 108 at 21). Defendants' argument implicates 20 U.S.C. § 1415(i)(3)(D)(*i*), which provides the following:

> Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if–

<ol type="I" start="1">
<li>the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;</li>
</ol>

<ol type="I" start="2">
<li>the offer is not accepted within 10 days; and</li>
</ol>

<ol type="I" start="3">
<li>the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.</li>
</ol>

As expressly indicated in the text of Defendants' November 16, 2007 Ten-Day Offer, the above statutory provision makes the offer relevant to this Court's analysis of Plaintiffs' request for attorney fees in Count I of their First Amended Complaint. The Court finds that the relief Plaintiffs finally obtained in the administrative process is not more favorable than the terms of the offer Defendants made on November 16, 2007, the date of their second (and more complete) Ten-Day Offer pursuant to 20 U.S.C. § 1415(i)(3)(D)(*i*).

First, regarding placement, on November 16, 2007, Defendants offered to "implement the placement set forth in the attached [May 14, 2007] IEP and ... provide T.W. with a placement consisting of a range of 120 to 150 minutes per day in a special education Resource Room staffed by a qualified special education teacher of the District's choosing on a schedule to be determined by the District. . . ." (Dkt 107, Attachment D at ¶ 1). Additionally, Defendants offered to implement the special education supports and related services set forth in the attached [May 14, 2007] IEP with the following modifications:

<ol type="a">
<li>In both the special education classroom and general education classroom T.W. will have access to, and be provided with, a classroom paraprofessional.</li>
<li>The District will provide an autism intervention specialist and a behavioral intervention specialist of the District's choosing to assist in the creation of an appropriate FBA/BIP and inclusion plan. . . .</li>
</ol>

      c.      The District agrees to share Kathleen Johnson's October 5, 2007 report regarding T.W. with the Northport and TBA ISD staff and the staff agree to implement the recommendations made by Kathleen Johnson in her report to the extent that such recommendations are able to be implemented without the need for an IEP Team meeting. . . .

Dkt 107, Attachment D at ¶ 2. On February 2, 2009, the IHO similarly provided that Defendants "shall afford Student a placement that conforms to the requirements of Findings of Fact ¶ 277 through 279" (Admin. Record, IHO Dec. & Order, p 141, ¶ 6), to wit: a "placement that affords him all the special education programs and services, related services, supplementary aides and supports specified in Jt-3," the May 14, 2007 IEP (*id.,* Findings of Fact, ¶ 277).

Second, regarding contracting with outside experts, Defendants offered on November 16, 2007 to contract with outside experts during the 2007-2008 school year under the following terms:

      a.      <u>Physical Therapy</u>: The District agrees to consult with a qualified, independent physical therapist during the 2007-2008 school year regarding T.W. This physical therapist will observe T.W. on-site at the Northport Public School and will conduct an evaluation with respect to T.W.'s need for direct physical therapy in the educational setting. Petitioners will be provided input into the identity of the physical therapist and the District agrees to consider their input in making the decision regarding the outside physical therapist's identity. The outside physical therapist will prepare a report, which report will then be considered at an IEP Team meeting where T.W.'s need for direct physical therapy at school will be revisited. Between the time of the acceptance of this offer and the convening of the IEP to consider the independent physical therapist's report, T.W. will receive 45 minutes of direct physical therapy per week when Northport Public School is in sesion [sic].

      b.      <u>Autism Consultant</u>: Provided that she is available and willing to do so, the District agrees to contract with Kathleen Johnson as an outside consultant in Autism Spectrum Disorder. The District will consult with Ms. Johnson for no less than 4 hours between the date of the acceptance of this offer and the end of the 2007-2008 school year. The District also agrees to encourage Ms. Johnson to attend the next annual review IEP for T.W. and agrees to reimburse Ms. Johnson for expenses that she may incur in attending that meeting. In the event that Ms. Johnson is unable or unwilling to serve in this role, the District will identify another qualified autism

spectrum disorder consultant with the Petitioners having input into the identity of the consultant.

(Dkt 107, Attachment D at ¶ 3). Similarly, on February 2, 2009, the IHO provided Plaintiffs with "consultative PT services from an independent PT expert ... to conduct an independent evaluation" and "consultative PT services of not less than 10 hours to provide the evaluative services found necessary" (Admin. Record, IHO Dec. & Order, p 140, ¶¶ 1 & 2).

Regarding Extended School Year (ESY) services, Defendants offered on November 16, 2007 to "convene an IEP meeting on or before April 30, 2008 to address whether T.W. requires extended school year services to receive a free appropriate public education, and if so, what extended school year services are required to receive a free appropriate public education" (Dkt 107, Attachment D at ¶ 4). On February 2, 2009, the IHO provided that "[e]ach year, including 2009, that Student remains eligible to receive consideration for summer ESY services from respondent, respondent shall make and communicate its offer or denial of ESY summer programming and services by the first day of the preceding April" (Admin. Record, IHO Dec. & Order, p 141, ¶ 5).

Regarding the Michigan Educational Assessment Prgram (MEAP) testing, on November 16, 2007, Defendants offered to "determin[e] through the IEP team process whether the MEAP and other grade-level standardized District testing is appropriate for T.W. in future school years" (Dkt 107, Attachment D at ¶ 5). The IHO did not expressly address MEAP testing in the section of the February 2, 2009 Decision and Order affording Plaintiffs relief.

Regarding reimbursement for Independent Educational Evaluations (IEEs), on November 16, 2007, Defendants offered to "reimburse Petitioners for the IEEs that were obtained by Petitioners" (Dkt 107, Attachment D at ¶ 6). On February 2, 2009, the IHO's Decision and Order

provided Plaintiffs with "$2,796.90 for their IEE expenses" (Admin. Record, IHO Dec. & Order, p 140, ¶ 4).

Regarding an Assistive Technology (AT) evaluation, on November 16, 2007, Defendants offered to "conduct or pay for another assistive technology evaluation of T.W., [with] the evaluation ... conducted by either a TBA ISD employee or an independent evaluator who is selected by the District with input from the parents" (Dkt 107, Attachment D at ¶ 7). On February 2, 2009, the IHO's Decision and Order merely provided that Defendants shall "supply petitioners of proper and complete notice, in writing, to inform them of the qualifications, expected costs and the district's suggested providers for an independent AT evaluation" (Admin. Record, IHO Dec. & Order, p 141, ¶ 7).

Last, on November 16, 2007, Defendants offered to "create a 'compensatory education bank' to be used for the educational benefit of T.W., [which would] consist of $5,000 or 100 hours of privately-provided educational or related services. . . ." (Dkt 107, Attachment D at ¶ 8). On February 2, 2009, nearly one and one-half years later, the IHO ordered Defendants to "provide compensatory education to Student for 768 hours as found necessary and as specified" (Admin. Record, IHO Dec. & Order, p 140, ¶ 3).

As the above comparison reveals, the results Plaintiffs obtained do not justify their prolonged efforts. With the exception of the increased hours of compensatory education awarded by the IHO, an increase that is largely attributable to the effect of the passage of time on T.W.'s "window of opportunity" (Admin. Record, IHO Dec. & Order, pp 129-130, Findings of Fact ¶ 270), the IHO provided Plaintiffs with the same relief Defendants had offered Plaintiffs over one year earlier. Indeed, in some respects, such as Defendants' offer to pay for another assistive technology

evaluation of T.W., the offer Defendants made was more favorable to Plaintiffs and T.W. than the forms of relief they ultimately obtained from the IHO.

As evidenced by Plaintiffs' refusal to voluntarily reduce or dismiss the issues that Defendants offered to remedy in November 2007, this case long ago ceased to serve the goal of ensuring that T.W. was provided with educational services that would meet his needs and help him achieve his potential. Defendants' offer gave Plaintiffs the opportunity to step back from the brink; instead, Plaintiffs proceeded with a lengthy administrative hearing that encompassed the topics addressed in the Ten-Day Offer, and Plaintiffs then filed this judicial action for their incurred attorney fees. Therefore, the Court, in its discretion and in accordance with the prohibitions found in 20 U.S.C. § 1415(i)(3)(D)(I), determines that on Count I of their First Amended Complaint, Plaintiffs' attorney fees will not be awarded and related costs will not be reimbursed for the services performed after the time of Defendants' November 16, 2007 written offer of settlement to Plaintiffs.[4]

The outcome Plaintiffs obtained by proceeding through these lengthy and contentious administrative and judicial proceedings does not warrant its enormous price tag. While Plaintiffs were free to resort to administrative and judicial action, the IDEA envisions that the parties to a

---

[4]The Court's decision renders moot the parties' tit-for-tat arguments on whether a reduction of attorney fees is warranted because the other party unnecessarily protracted this action (Dkt 107 at 17-22; Dkt 106 at 29, Dkt 105 at 30). *See* 20 U.S.C. § 1415(i)(3)(F) (providing that the court shall reduce the amount of attorney fees awarded "whenever the court finds that– (i) the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy"); 20 U.S.C. § 1415(i)(3)(G) (providing that the exception in subparagraph (F) "shall not apply in any action or proceeding if the court finds that the State or local educational agency unreasonably protracted the final resolution of the action or proceeding"). Although the arguments are moot, they do serve to exemplify the type of acrimony present in this case. In any event, as Defendants point out, the manner in which this litigation proceeded did not uniquely impact Plaintiffs' financial resources; rather, Defendants, like Plaintiffs, "have incurred well over $400,000 in attorney fees and costs in this case" (Dkt 108 at 21).

dispute should resolve their differences cooperatively. *See Schaffer,* 546 U.S. at 53. And this particular IDEA provision, 20 U.S.C. § 1415(i)(3)(D)(*i*), specifically removes the expectation of a recovery of attorney fees and costs when the parties' subsequent efforts do not contribute to resolving their dispute.

That said, the Court perceives that Defendants' unwise decision to expressly exclude attorney fees and related costs from the November 16, 2007 settlement offer does substantially justify Plaintiffs' refusal to accept the offer. *See* 20 U.S.C. § 1415(i)(3)(E) ("Notwithstanding subparagraph (D), an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer."). Accordingly, the Court, in its discretion, will enter Judgment in favor of Plaintiffs on Count I but only to the extent the Court determines Plaintiffs are entitled to their reasonable attorney fees and related costs for the work performed before the November 16, 2007 written offer. Barring the parties' ability to file with the Court a stipulated amount for reasonable attorney fees and related costs for the work performed by Plaintiffs' attorney before the November 16, 2007 written offer of settlement, Plaintiffs may file documentation with the Court to support their costs and a reasonable attorney fee award, and Defendants may file a response to the documentation. *But see Hensley,* 461 U.S. at 437 (cautioning that "[a] request for attorney's fees should not result in a second major litigation").

### III. PLAINTIFFS' BREACH OF CONTRACT CLAIM

### A. Jurisdiction

In Count VI of their First Amended Complaint, Plaintiffs allege a "Supplemental State Law Breach of Contract Claim" arising from their October 2005 settlement agreement, which

incorporated by reference the June 6, 2005 IEP, with certain amendments (Dkt 4 at 40-44). Plaintiffs allege that "[t]his Court has jurisdiction to hear the pendant state claims that may be raised in this matter under the doctrine of supplemental jurisdiction set forth at 28 U.S.C. § 1367" (Dkt 4 at 3, First Amended. Compl. ¶ 8). Although Defendants do not dispute Plaintiffs' jurisdictional statement, subject-matter jurisdiction may not be conferred merely by agreement of the parties.

Congress has expressly provided for enforcement of IDEA settlement agreements in federal court when the agreement at issue was entered into "through the [IDEA] mediation process," 20 U.S.C. § 1415(e)(2)(F)(iii), or at a "resolution session," § 1415(f)(1)(B)(iii)(II). Although the parties at bar previously engaged in an "IDEA approved Third-party mediation," the October 2005 settlement agreement was the result of efforts between the parties and their attorneys, and not the result of a mediation initiated after Plaintiffs filed their due process complaint in June 2005 (Dkt 4 at 40, First Amended Compl., ¶¶ 131-132; Admin. Record, Pls.' Post-Hr'g Br. at 11-12, Dfs.' Post-Hrg Br. Ex. C-6 at 31-32; Dkt 29, 6/22/2009 Hr'g Tr at 30). Consequently, the October 2005 settlement agreement is not a "mediated settlement" within the meaning of the IDEA that may be enforced in federal court under 20 U.S.C. §§ 1415(e)(2)(F)(iii). Further, the Court observes that in their pleading of Count VI, Plaintiffs are not so much seeking to enforce the October 2005 settlement agreement as they are to remedy an alleged breach of the agreement.

Hence, this Court agrees with Plaintiffs that this Court's jurisdiction over Count VI, if any, would constitute an exercise of its supplemental, not original, jurisdiction (Dkt 4 at 3, First Amended Compl. ¶ 8). Generally, where district courts have original jurisdiction, they also have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution." 28 U.S.C. § 1367. *See, e.g., Bishop v. Oakstone Acad.*, 477 F. Supp. 2d 876, 885 (S.D. Ohio 2007) (exercising supplemental jurisdiction over state law breach of contract claim in IDEA case); *Aaron M. ex rel. Glen M. v. Yomtoob*, No. 00-C-7732, 2001 WL 1465251, at *2 (N.D. Ill. 2001) (same).

Plaintiffs' Count VI forms part of the same controversy as the federal claims in Counts I through V, as evidenced by this Court's reliance on the IHO's findings of fact and conclusions of law relative to the settlement agreement. Further, the IHO's findings of fact and conclusions of law relative to the settlement agreement also indicate that the claim has been administratively addressed and exhausted. *See School Bd. of Lee Cnty., Fla. v. M.M. ex rel. M.M.,* 348 F. App'x 504, 511-512 (11th Cir. 2009) (holding that "a parent's claim that a school board breached the provisions of a settlement agreement that had resulted from an IDEA due process hearing is also primarily a challenge relating to the provision of a FAPE and must be addressed administratively"); *Traverse Bay Area Intermediate Sch. Dist. v. Michigan Dep't of Educ.*, No. 5:06-cv-139, 2007 WL 2219352, at *10 (W.D. Mich. July 27, 2007) ("requiring exhaustion of claims alleging breach of a settlement agreement, especially where such claims relate to the provision of a FAPE"). Consequently, this Court exercises supplemental jurisdiction over Count VI under 28 U.S.C. § 1367.

### B. Standard of Review

Plaintiffs contend that this Court should grant them summary judgment under FED. R. CIV. P. 56 on their breach of contract claim (Dkt 105 at 27), and Defendants do not indicate any disagreement with this vehicle for resolution. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, the court must

view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Ullmo ex rel. Ullmo v. Gilmour Acad.*, 273 F.3d 671, 676 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The court is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' A genuine issue for trial exists only where there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## C. Analysis

In exercising supplemental jurisdiction over a state law breach of contract claim, this Court must decide this claim applying Michigan law. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Under Michigan law, to prevail on a breach of contract claim, a plaintiff must prove by a preponderance of the evidence: (1) the existence of a valid contract, (2) breach of the contract, and (3) damages that flow from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (applying Michigan law). If a plaintiff is unable to prove damages, a breach of contract claim fails. *See Aron Alan, LLC v. Tanfran, Inc.*, No. 1:04-cv-816, 2006 WL 305971, at *5 (W.D. Mich. Feb. 8, 2006) (quoting *Barlack v. Mackler Bros.*, No. 181281, 1996 WL 33360419, at *3 (Mich. Ct. App. Aug. 20, 1996) (per curiam) ("Plaintiffs' breach of contract claim fails because a showing of damages is a necessary element in a claim for breach of contract."); *New Freedom Mortg. Corp. v. Globe Mortg. Corp.*, 761 N.W.2d 832, 837 (Mich. Ct. App. 2008) ("[I]f there are no damages, it is appropriate to grant summary disposition on fraud, misrepresentation, breach of contract, and negligence claims.").

Plaintiffs' Count VI is based on the provision in the parties' October 2005 settlement agreement setting forth their agreement that Defendants "will contract with an outside expert in

physical therapy of its choosing to provide a minimum of 4 hours consultative physical therapy between the date this Agreement is signed and June 6, 2006" (Admin. Record, Joint Ex. 1-23). The parties agreed that the outside expert was to (1) review the IEP, and (2) evaluate and assess T.W. and "make recommendations to the IEP Team regarding [T.W.'s] ongoing need for physical therapy at school beyond the 2005-2006 school year" (*id.* 1-23, 24). These particular services were "not to be considered an amendment to or part of the June 6, 2005 IEP" (*id.* 1-23).

The parties do not dispute that Jill Fisher, Ph.D., conducted the first part of the outside physical therapy work and that Amy Powell conducted the second part. An examination of the breach Plaintiffs allege is inextricably intertwined with the core decision made by the IHO, who examined whether Defendants' determinations of physical therapy services under the settlement agreement either procedurally or substantively violated the IDEA. The IHO found that Powell was an "an agent of the school districts" and therefore was "not a reasonable substitute for an outside PT expert" (Admin. Record, IHO Dec. & Order, p 26). The IHO determined that Defendants were "liable for the resulting lack of impartial and objective information from which the IEP team likely could have accurately identified Student's needs" (*id.,* p 27).

The IHO concluded the following:

4.   Petitioners have shown, by a preponderance of the evidence under either a strict compliance or substantial compliance analysis, that respondent did not carry out its obligation to secure an evaluation of Student and recommendation for services by an outside PT expert where the evaluation instrument was administered by and scored by an in-house employee who had never before used the instrument and who failed to adhere to the guidance provided by the chosen outside expert.

5.   Respondent's dereliction of its obligation under the IEP/settlement to obtain an evaluation by an outside expert is not excusable on the ground that the outside evaluator's conclusions, had they been obtained, would not have been binding on the IEP team in its subsequent decision regarding the matter.

Admin. Record, IHO Dec. & Order, p 135, Conclusions of Law ¶¶ 4 & 5. The IHO awarded Plaintiffs the following relief: "[w]ithin 10 school days of Student's re-enrollment in respondent school, respondent must provide compensatory PT services to objectively assess Student's then-present level of physical functioning" (*id.*, p 128, Finding of Fact ¶ 263).

In their cross-motion, Plaintiffs argue that the IHO properly determined "that the October 2005 Settlement Agreement was breached but then failed to award sufficient relief to adequately address the expectations of the Parents in entering into the contract" (Dkt 105 at 26-28). In other words, in alleging Count VI, Plaintiffs are not asking this Court to examine the elements of a breach-of-contract claim but the proper remedy for their damages resulting from the breach. Plaintiffs opine that an appropriate award would permit them to obtain the "benefit of their bargain" (*id.* at 27). Specifically, in lieu of the compensatory physical therapy services the IHO awarded them, Plaintiffs seek for this Court to "modify the IHO's Order to require the Defendants to pay to the Parents the sum $3,400.00 so as to allow the Parents to retain and travel to a qualified private Physical Therapist to obtain the ordered compensatory services" (Dkt 104 at 6).

Defendants do not dispute the material facts of Plaintiff's breach of contract claim but respond that their conduct constitutes "substantial compliance" with their contractual obligation and that any technical failure to follow the agreement was "de minimis" because Dr. Fisher guided Powell's evaluations and endorsed the results of the evaluations (Dkt 108 at 19-20). Further, Defendants point out that they offered Plaintiffs the monetary remedy that they seek as part of its Ten-Day Offer under 20 U.S.C. § 1415(i)(3)(D)(*i*)(I & II), before the due process hearing in this case even began (*id.* at 20).

Defendants' substantial-compliance argument was properly rejected by the IHO, who concluded that Plaintiffs showed, by a preponderance of the evidence under either a strict compliance *or* substantial compliance analysis, that Defendants did not satisfy their contractual obligation arising from the pertinent provision of the settlement agreement (Admin. Record, IHO Dec. & Order, p 135). The Court finds the IHO's conclusion well supported by the IHO's findings. Specifically, the IHO found that "Dr. Fisher provided advice and assistance to Ms. Powell and had provided her with a copy of the assessment instrument;" however, the IHO also found that "Ms. Powell's report and the supporting documentation shows that Ms. Powell's administration did not adhere to the example and advice provided by Dr. Fisher" (*id.*, pp 23-24, Findings of Fact, ¶¶ 27, 29). The Court agrees with Plaintiffs that there is more than sufficient evidence in the record from which to conclude that there is no material dispute that Defendants breached this term of the October 2005 settlement agreement.

As noted, the crux of this issue is Plaintiffs' damages, if any, which Plaintiffs must prove to prevail. The settlement agreement requires *Defendants* to "contract with an outside expert in physical therapy of its choosing," which is the remedy the IHO has already properly awarded (Admin. Record, Joint Ex. 1-23). The settlement agreement does not require Defendants to provide *Plaintiffs* with money to procure an outside expert in physical therapy of their choosing. Plaintiffs do not seek the benefit of their bargain but a remedy that they perceive as a "better bargain." That Plaintiffs now believe that the settlement terms to which they agreed no longer provide adequate relief for T.W. is not a basis for claiming damages. In other words, the wrong was remedied.

The Court holds that Plaintiffs are therefore not entitled to judgment as a matter of law on Count VI. Conversely, because Plaintiffs cannot show damages flowing to them from this breach, Defendants are entitled to judgment as a matter of law in their favor on Count VI.

## IV. CONCLUSION

For the foregoing reasons, the Court determines that Defendants' Motion for Judgment on the Administrative Record pursuant to FED. R. CIV. P. 12(c) (Dkt 103) is properly DENIED, and Plaintiffs' Cross-Motion for Summary Judgment or Alternatively Judgment on the Administrative Record (Dkt 104) motion is properly GRANTED IN PART and DENIED IN PART. An Order and corresponding Judgment will be entered consistent with this Opinion.

While this decision perhaps provides some closure, the result the parties have achieved after years of effort and seemingly endless resources expended at the administrative level and now at the judiciary level, is ultimately dissatisfying, at least to this author. The Court is not convinced that the result for T.W. is any better than the result that could have been negotiated years ago. Indeed, after glimpsing the landscape, the Court assumes that this Court is but a stop along the long path of litigation from which the parties seem to be unable – or unwilling – to leave.


Date: March 31, 2011                          /s/ Janet T. Neff
                                              JANET T. NEFF
                                              United States District Judge